IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

WILLIAM PATTERSON,              :        CIVIL ACTION
                                :
            Plaintiff,          :        NO. 08-2140
                                :
        v.                      :
                                :
CITY OF PHILADELPHIA, et al.    :
                                :
            Defendants.         :

**MEMORANDUM AND ORDER**

Jones, J.                                                April 30, 2009

This matter arises out of the arrest of William J. Patterson ("Plaintiff") for allegedly

having indecent contact with two minors, and Plaintiff's subsequent acquittal of related charges

in the Philadelphia Court of Common Pleas.  Plaintiff, acting *pro se*, has brought suit against a

variety of actors for a wide variety of claims stemming from this incident.  Now pending before

the Court are four motions to dismiss: (1) Defendants Knight and Kirchner's Motion to Dismiss

Pursuant to Fed. R. Civ. P. 12(b)(6) (Docket No. 18) ("**First Motion to Dismiss**"); Defendants

City of Philadelphia, Stephen Ratka, Harry Young, Daniel O'Malley, John Darby, Joseph

Mooney, Jeanette Dooley, Glenn Wilson, Ingo Schamber and Leni Dow's Motion to Dismiss

Causes of Action Twelve Through Fifteen of the Complaint Pursuant to Rule 12(b)(6) (Docket

No. 16) ("**Second Motion to Dismiss**"); Supplemental Motion to Dismiss of Defendants John

Darby, Joseph Mooney, Jeannette Dooley, Ingo Schamber and Leni Dow Solely in Their

Capacity as Members of the Philadelphia Children's Alliance Board of Directors (Docket No. 20)

("**Third Motion to Dismiss**"); and Defendants Lynne Abraham, John Delaney, Charles Ehrlich,

1

James Carpenter and Eric Gibson's Motion to Dismiss (Docket No. 24) ("**Fourth Motion to**

**Dismiss**").  These motions will be decided as discussed below.

I.      **Facts and Procedural Posture**

        None of the moving defendants has attempted to offer a comprehensive statement of the

facts as alleged in Plaintiff's rambling, oft-confusing 295-paragraph Complaint, and, indeed, to

attempt to do so would be a Herculean task as Plaintiff has blended factual assertions (which are

sometimes unintelligible) with legal arguments and conclusions throughout the Complaint.

While the Court has considered the Complaint in its entirety and may refer to specific paragraphs

in its discussion, for the purposes of this section the Court will merely attempt to provide a short,

salient summary of Plaintiff's factual allegations.

        The Philadelphia District Attorney's Office, Special Victims Unit of the Philadelphia

Police, Philadelphia Department of Human Services ("DHS") and the Philadelphia Children's

Alliance[1] ("PCA") have formed a Multi-Disciplinary Team ("MDT") to act as a clearinghouse

for resources and information and to steer reported cases of child abuse for investigation.[2]

---

[1] The Board of Directors of the Philadelphia Children's Alliance includes representatives
of the District Attorney's Office, Police Department, and Department of Human Services.
Complaint ¶ 8.

[2] Relevant employees from District Attorney's Office and Police Department – all
members of the MDT – include:
• District Attorney Lynne Abraham
• Assistant District Attorney ("ADA") Eric Gibson
• ADA James Carpenter
• ADA Charles Ehrlich (also a member of the Board of the PCA)
• ADA John Delaney (also a member of the Board of the PCA)
• Officer Stephen Ratka
• Detective Harry Young
• Detective Daniel O'Malley
• Detective John Darby (also a member of the Board of the PCA)

Complaint ¶ 6.  *Inter alia*, Plaintiff alleges that the MDT, via the PCA, engages in the practice of

"Friendosexuality" (sex with therapists and/or patients); is a "cult;" "recruits for power, politics

and sex;" has supported "terrorism;" has professed "Anti-Semetic beliefs;" and is not providing a

safe environment for children.  Id. at ¶ 14-15.  Moreover, Plaintiff alleges that the MDT "through

its administration, policy and training has used [its] monopoly for political, business and personal

gains."  Id. at ¶ 75.  Plaintiff alleges that the MDT also "has not established or followed accepted

protocols and procedures."  Id. at ¶ 79.  Finally, Plaintiff alleges that "[t]he goal of the [MDT] is

to create probable cause in order to obtain an arrest, indictment and conviction."  Id. at ¶ 80.

Plaintiff alleges that the PCA is the "lead agency in sexual abuse cases," and that its

forensic investigators handle investigative child interviews for the police.  Id. at ¶ 97.  Once a

child is referred into the MDT system via the PCA, Plaintiff alleges that an "MDT member can

create and manipulate evidence and circumstances to fit their needs."  Id. at ¶ 101.  Plaintiff

alleges that the police use the PCA to "hide" evidence when the proper procedure is for the

police to "hold" evidence.  Id. at ¶ 102.  Plaintiff further alleges that PCA employees are cult

leaders who exploit the PCA to get their cult tactics adopted "for their own personal,

professional, political and public relations gains."  Id. at ¶ 162.

The mother of the two children at issue in the underlying criminal case against Plaintiff

first contacted DHS on January 6, 2006.  Id. at ¶ 43.  No background check was conducted on the

---

• Inspector Joseph Mooney (also a member of the Board of the PCA)
• Inspector Jeanette Dooley (also a member of the Board of the PCA)

 Id. at ¶ 20-30.  Relevant employees of the PCA include PCA forensic specialist Kerry Knight
(also a member of the MDT), PCA program director and/or forensic specialist Jacqueline Block
Goldstein, and PCA Executive Director Christina Kirchner.  Id. at ¶ 31-33.  Relevant employees
of DHS included Glenn Wilson (also a member of the MDT), Ingo Schamber (also a member of
the Board of the PCA), and Leni Down (also a member of the Board of the PCA).  Id. at ¶ 34-36.

mother. Id. at ¶ 91.  According to Plaintiff, DHS "manipulated and/or manufactured a psychologist report based on the mother's statements." Id. at ¶ 92.  On January 11, 2006, Officer Radka and Detective Young interviewed the children's parents. Id. at ¶ 47-49.  At the same time, Ms. Kerry Knight of the PCA interviewed the older child. Id. at ¶ 77; 97.  During the interview, the child drew a picture that was later kept in PCA files instead of given to the police. Id. at ¶ 97.  In addition, the child brought another picture he had drawn at home, and Knight again placed it into the child's PCA file instead of giving to the police. Id. at ¶ 141.  In her notes, Knight described the father of the child as a police officer, but noted no one else's occupation. Id. at ¶ 108.  Plaintiff alleges that this was a signal to others to "do what they have to do in order to manufacture and/or manipulate the interview so that probable cause could be created" against him. Id. at ¶ 123.  DHS and the police then referred the children to therapy through the PCA. Id. at ¶ 49-51.  Plaintiff alleges that, in so doing, DHS, in conjunction with the District Attorney's Office, "defrauded the Federal Government" by padding statistics used to apply for grant money. Id. at ¶ 94; 106.

Subsequently, Plaintiff alleges that Officer Radka created an affidavit in application for a search warrant that attributed to the older child statements actually made by the mother in different contexts. Id. at ¶ 67.  Furthermore, Plaintiff alleges that Detective Young wrote part of the affidavit of probable cause for the arrest warrant, and therein falsely listed himself as an observer of the interview with of the older child. Id. at ¶ 69.  Both Radka and Young based their affidavits on the notes of Kerry Knight, the child's PCA interviewer. Id. at ¶ 97.  Accordingly, the MDT, including the PCA, District Attorney's Office, and Police Department, "manipulated, manufactured and concealed evidence in order to gain arrest and conviction of an alleged

4

perpetrator..."  Id. at ¶ 75; see also id. at 127, 130.

The search warrant was served at Plaintiff's residence on February 3, 2006.  Id. at ¶ 82.
Plaintiff alleges that he felt intimated and was not told why his home was being searched.  Id.  A
camera was seized during the search.  Id. at ¶ 114.  Plaintiff alleges that the MDT mishandled
evidence gathered in the search of Plaintiff's residence in an effort to create probable cause.  Id.
at ¶ 135-40.  The MDT seized Plaintiff's desktop computer, laptop computer, home movies, and
CDs and had them analyzed; however no report on their contents was ever furnished to Plaintiff.
Id. at ¶ 135-38.

The police asked Plaintiff to come to their offices on February 6, 2006, for an interview,
but would still not tell Plaintiff why he was being investigated.  Id. at ¶ 83.  The police asked
Plaintiff to submit to an interview by the MDT, to take a polygraph test, and submit to a second
interview after the test, but still would not tell Plaintiff why he was being investigated.  Id. at ¶
85.  On November 6, 2006, Plaintiff was informed of the specific charges against him and
received an "offer" from the District Attorney's Office of 2 to 4 years in prison, 15 years of sex
offender probation and no contact with children under eighteen years of age.  Id. at ¶ 86.

Plaintiff received discovery from the District Attorney's Office in December of 2006.  Id.
The two pictures drawn by the older child were provided to Plaintiff two days before his
scheduled trial date.  Id. at ¶ 141.  Plaintiff was acquitted by the Hon. Joseph Dych in the
Philadelphia Court of Common Pleas.  See Commonwealth v. William Patterson, CP-51-CR-
1300306-2006.  After Plaintiff's trial ended, he sought the return of his property.  Plaintiff's
attorney was told that "Plaintiff had better not come" to the police department.  Id. at ¶ 147.
Plaintiff alleges that "[b]ased on a history of Philadelphia Police brutality, the Plaintiff took the

threat against himself and his wife seriously." Id. Plaintiff and his wife sat in the car "with their

hands on their cell phone dialed to 911" while their two sons went into the police department to

retrieve Plaintiff's property. Id. at ¶ 148. Now, "[t]he Plaintiff and his family live in constant

fear of the police state that the Philadelphia Police Department and the District Attorney's Office

have established." Id. at ¶ 152.

## II.    Legal Standard

In deciding a motion to dismiss pursuant to Rule 12(b)(6), courts must "accept all factual

allegations as true, construe the complaint in the light most favorable to the plaintiff, and

determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled

to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (internal quotation

and citation omitted). After the Supreme Court's decision in Bell Atlantic Corp. v. Twombly,

550 U.S. 544 (2007), "it is no longer sufficient to allege mere elements of a cause of action;

instead a complaint must allege facts suggestive of the proscribed conduct." Phillips, 515 F.3d at

233 (quoting Twombly, 550 U.S. at 563 n.8) (internal quotation and alteration omitted). To

withstand a motion to dismiss under Rule 12(b)(6), "factual allegations must be enough to raise a

right to relief above the speculative level." Phillips at 234 (quoting Twombly, 550 U.S. at 555)

(alternation omitted). Thus, stating a claim "requires a complaint with enough factual matter

(taken as true) to suggest the required element." Id. (quoting Twombly, 550 U.S. at 556)

(internal quotation omitted). Pro se litigants must "abide by the Federal Rules of Civil Procedure

and when confronted by motions to dismiss must articulate reasons why the motions should not

be granted." Nanya-Nashut ex rel. Hand v. BankOne, 2003 WL 22120263, at *2 (E.D. Pa.

September 9, 2003).

6

III.    **Discussion**

The Court will address the Motions to Dismiss *seriatim*.

A.    **First Motion to Dismiss**

As a threshold matter, by his response Plaintiff has not opposed dismissal of the

following claims:

a.    All claims against Defendant Kirchner;[3]

b.    Count 11 (obstruction of justice) against Defendant Knight; and

c.    Count 15 (negligent infliction of emotional distress) against Defendant Knight.

In addition, Plaintiff has not responded to Defendants' arguments concerning Counts 7-8 (42

U.S.C. § 1985) and 9 (42 U.S.C. § 1986).  Nevertheless, the Court has considered these claims,

To state a claim under § 1985, a plaintiff must allege four things: (1) a conspiracy; (2) motivated

by a racial or class-based discriminatory animus designed to deprive, directly or indirectly, any

person or class of persons of the equal protection of the laws; (3) an act in furtherance of the

conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a

citizen of the United States.  Magnum v. Archdiocese of Philadelphia, 253 Fed. Appx. 224, 230

(3d Cir. 2007) (citing Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971); Brower v. Horowitz,

535 F.2d 830, 839 (3d Cir. 1976) (describing the elements of a Section 1985 violation)).[4]

Animus against an individual is not sufficient; animus must be class-based. See, e.g., Kimble v.

---

[3] Plaintiff's Complaint also names PCA employee Jacqueline Block Goldstein as a Defendant, but beyond that contains no factual allegation pertaining to her.  Although (likely for that reason) the First Motion to Dismiss did not specifically address Ms. Goldstein, the Court will dismiss the claims as to her as well.

[4] Section 1986 creates a constitutional tort claim for failing to prevent violations of Section 1985; without the prerequisite 1985 violation, there can be no Section 1986 claim.

<u>D.J. McDuffy Inc.</u>, 648 F.2d 340, 346-47 (5th Cir.) (en banc), <u>cert. denied</u>, 454 U.S. 1110 (1981).

The Court agrees with Defendants that Plaintiff cannot survive a motion to dismiss his Section

1985 claims because he has not alleged that he is a member of a protected class; rather, he has

only alleged that either he himself was persecuted or that people implicated in sexual abuse

inquiries were abused.  <u>Cf</u>. <u>Buranen v. Hanna</u>, 623 F. Supp. 445, 451 (D. Minn. 1985) (allegation

of membership in a class of people who were criminally prosecuted because they have potential

brutality claims against police did not satisfy class-based animus requirement of Section 1985).

Accordingly, Counts 7-9 shall be dismissed.

The Court will now analyze the sufficiency of the remaining claims against Defendant

Knight.  The Complaint contains limited allegations as to Defendant Knight.  Those are as

follows:

> a.    She failed to ask the older child's parents for the results from previous psychological counseling (Complaint ¶ 60);
> b.    She did not tape the interview with the older child (Complaint ¶ 63);
> c.    She noted that the older child's father was a Philadelphia police officer (Complaint ¶ 108, 123, 129), thus allegedly "sen[ding] the signal to the other team members to do what had to be done to manufacture and/or manipulate the interview so that probable cause could be created" (Complaint ¶ 129); and
> d.    She kept two of the older child's drawings in PCA files instead of providing them to the police (Complaint ¶ 142).

Beginning with paragraph 46 of the Complaint, Plaintiff refers to a nebulous group of

"Supervisory Defendants," but there is no allegation that Defendant Knight is a member of this

group.  The Complaint does, however, allege that Defendant Knight was a member of the MDT.

It avers that the MDT used its "monopoly for political, professional, business, personal gains and

public relations gains."  Complaint ¶ 9.  It further asserts that the MDT "manipulated,

manufactured, and concealed evidence in order to gain arrest and prosecution of the Plaintiff,

thus depriving him of his civil rights under the Constitution of the United States." Complaint ¶ 10.[5] The specific remaining claims in the Complaint against Defendant Knight are as follows.

### 1.    Count 14: Negligent Supervision

The Complaint does not allege misconduct by Defendant Knight related to this Count (which could only, if at all, possibly relate to Defendant Kirchner). It will therefore be dismissed.

### 2.    Count 12: Intentional Infliction of Emotional Distress

One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm. Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir. 1979). In order to state a claim for intentional infliction of emotional distress, the plaintiff must allege the following four elements: (1) conduct that is intentional or reckless; (2) conduct that is extreme and outrageous; (3) conduct that causes emotional distress; and (4) conduct that is severe. Id.; see also, e.g., Armstrong v. Paoli Mem. Hosp., 633 A.2d 605, 608 (Pa. Super. 1993), app. denied, 649 A.2d 666 (1993) (explaining that the test for the tort of intentional infliction of emotional distress in Pennsylvania is the outrageousness of the conduct and the degree to which the emotional distress has created medically-documented physical symptoms). Indeed, "[t]he conduct must be so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." Rowlands v. Roman Catholic Diocese of Pittsburgh, 2005 WL 3234324, *2 (W.D. Pa. Nov. 30, 2005) (citing Cox v. Keystone

---

[5] The MDT itself is not a party to this action.

Carbon Co., 861 F.2d 390, 395 (3d Cir.1988)).  "Severe" emotional distress includes "fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry and nausea."  See Restatement (Second) of Torts § 46, cmt. j (1977).  Moreover, the emotional distress must be accompanied by some physical manifestation.  See Corbett v. Morgenstern, 934 F. Supp. 680, 684-85 (E.D. Pa. 1996) (holding symptoms of severe depression, nightmares, anxiety and ongoing mental and physical harm are sufficient) (citing Love v. Cramer, 606 A.2d 1175, 1179, (Pa. Super. 1992), *app. denied*, 621 A.2d 580 (1992)) .

While a very close question, the Court finds that Plaintiff's allegations against Defendant Knight are barely sufficient.  Plaintiff has alleged that Defendant Knight, personally and in concert with others, manipulated the results of a crucial interview with a potentially abused child in order to manufacture probable cause for Plaintiff's arrest.  These alleged actions, if true, could be considered intentional or reckless as well as outrageous and atrocious in character.  In addition, Plaintiff's Complaint alleges that he suffered severe emotional distress.  See Complaint at ¶¶ 277-78 (alleging that Plaintiff suffered and continues to suffer "emotional and mental conditions generally recognized and diagnosed by trained professionals" including "disabling emotional, mental, and physical harm.").  Accordingly, while Plaintiff's Complaint as to this Count barely meets the standard to survive a Motion to Dismiss, this Count will not be dismissed.

### 3.   Count 10: Malicious Prosecution

In Pennsylvania, a party bringing a malicious prosecution claim must demonstrate that (1) the defendants instituted a criminal proceeding, (2) without probable cause, (3) with malice, and (4) that the proceedings were terminated in favor of the plaintiff.  Mateiuc v. Hutchinson, No.

Civ. A. 97-1849, 1998 WL 42306, at * 3 (E.D. Pa. January 7, 1998) (citing Strickland v. Univ. of Scranton, 700 A.2d 979, 984 (Pa. Super. 1997)).  Plaintiff's Complaint fails the first prong of this test.  Defendant Knight did not institute a criminal proceeding against the Plaintiff.  According to Plaintiff's Complaint, the complaint against him was brought in the first instance by the child in question and/or his parents.  Complaint ¶¶ 2-3, 118.  Even if one were to ignore the parents' complaint and move forward in time, the most that could be said is that the police or the District Attorney's office instituted the criminal proceeding.  Defendant Knight worked for neither.  She was a specialist for the PCA who merely interviewed a child.[6]  Put simply, Defendant Knight could not have instituted, and did not institute, any proceedings against the Plaintiff.

Accordingly, this Count will be dismissed.

### 4.    Counts 1-6: 42 U.S.C. § 1983

The elements of a malicious prosecution action under 42 U.S.C. § 1983 are the same as the common law tort of malicious prosecution.  Lee v. Mihalich, 847 F.2d 66, (3d Cir. 1988).  As a result, where Section 1983 claims are predicated upon malicious prosecution, and the underlying claims fails, the Section 1983 claim must also fail.  The Court agrees with Defendant that all of Plaintiff's Section 1983 Counts are predicated upon Plaintiff's malicious prosecution claim.  As explained above, Plaintiff's malicious prosecution claim fails.  Accordingly, Plaintiff's Section 1983 claims also fail.  Counts 1 through 6 will therefore be dismissed.

In conclusion, all Counts against Defendant Knight will be dismissed except Count 12, alleging intentional infliction of emotional distress.

---

[6] Plaintiff has conceded in his Complaint that the PCA is a "private, non-profit organization not an authorized government agency."  Complaint ¶ 66 (emphasis added).  As such, the Complaint does not assert that the PCA worked for any government entity.

11

**B.     Second and Third Motions to Dismiss**

In the last four months, Plaintiff has not filed any response to the Second and Third

Motions to Dismiss.  There is no question that Plaintiff was capable of doing so.  Plaintiff timely

filed a brief in opposition to the First Motion to Dismiss and, albeit several months late, filed a

brief in opposition to the Fourth Motion to Dismiss.  These briefs were lengthy, reasonably

coherent, and contained citations to legal authority.  The Court therefore interprets Plaintiff's

failure to oppose the Second and Third Motions to Dismiss as a concession.  See, e.g., McNiff v.

Asset Mgt. Specialists, 337 F. Supp. 2d 685, 687 n.2 (E.D. Pa. 2004); Hernandez v. Ima S.R.L.,

2004 U.S. Dist. LEXIS 1301 (E.D. Pa. January 29, 2004); Fiore v. Giant Food Stores, 1998 U.S.

Dist. LEXIS 5418 (E.D. Pa. Apr. 17, 1998).

Accordingly, all claims against Defendants City of Philadelphia, Stephen Ratka, Harry

Young, Daniel O'Malley, John Darby, Joseph Mooney, Jeanette Dooley, Glenn Wilson, Ingo

Schamber and Leni Dow (in either their capacity as city employees or PCA board members) will

be dismissed.

**C.     Fourth Motion to Dismiss**

Plaintiff untimely filed his response to the Fourth Motion to Dismiss over three months

after the motion was filed.  As mentioned, failure to respond to a properly filed motion within the

time set forth in Local Rule 7.1 permits the Court to treat the motion as uncontested.  McNiff,

337 F. Supp. 2d at 687 n.2; Wright v. Montgomery County, 1999 U.S. Dist. LEXIS 900 (E.D. Pa.

Jan 26, 1999).  However, where the interests of justice would be disserved by adherence to the

rule's constraints, the court is free to disregard the technical mandates of the rule and focus on

the merits.  See, e.g., Marsden v. Select Med. Corp., 2005 U.S. Dist LEXIS 714 (E.D. Pa. Jan.

18, 2005).  The tendency of courts to overlook time issues is especially noteworthy in *pro se*

cases.  See, e.g., Zamichieli v. Stott, 1999 U.S. Dist. LEXIS 9705 (E.D. Pa. June 30, 1999).

Based on these principles, and in recognition of the Third Circuit's admonitions to accommodate

*pro se* litigants, the Court will consider Plaintiff's response in opposition to the Fourth Motion to

Dismiss.

### 1.     Defendant Eric Gibson

Defendant Eric Gibson contends that he was not properly served with the Complaint, and

therefore he is not properly named as a Defendant in this action.  The Court agrees.

Although the DA Defendants approved a waiver of service on September 26, 2008, Mr.

Gibson did not, because he had resigned from the DA's office over two years before – on June 2,

2006.  After resigning, there is no record of Mr. Gibson designating anyone at the DA's office to

accept service for him.  On September 18, 2008, an agent of the Plaintiff attempted to serve Mr.

Gibson by leaving a copy of the Complaint in a brown envelope at the DA's office security desk.

Under Fed. R. Civ. P. 4(e)(2), a plaintiff may either deliver process "to the person

individually," deliver process to a person "at the individual's dwelling place or usual place of

abode, or deliver process to "an agent authorized by appointment or law to receive service of

process."  Service to Mr. Gibson's former place of employment is insufficient under this rule.

Even if service was not authorized under Rule 4(e) (2), however, it may still be effective under

Rule 4(e)(1).  That subpart provides that alternative methods of delivering service are effective if

they are authorized under state law.  See Fed. R. Civ. P. 4.  As relevant here, the Pennsylvania

Rules of Civil Procedure allow a plaintiff to serve a defendant with a complaint either by

"handing a copy to the defendant," or by handing a copy "at any office or usual place of business

of the defendant to his agent or to the person for the time being in charge thereof." Pa. R. Civ. P.

402. At the time of attempted service, the DA's office was not, and had not been for two years,

the office or usual place of business of Mr. Gibson. Cf. Johnson-Lloyd v. Vocational

Rehabilitation Office, 813 F.Supp. 1120, 1125 (E.D. Pa. 1993) (dismissing complaint against

retired employee for insufficient process where service attempted at office of employer).

Plaintiff has had sufficient opportunity to effectuate service on Mr. Gibson, but has failed

to do so.[7] As such, Mr. Gibson has not been served with process within the 120 day period

contemplated by Federal Rule of Civil Procedure 4. Accordingly, the Court will dismiss Mr.

Gibson from this action.

### 2.      The DA Defendants[8]

#### a.      Claims Against DA Defendants in Their Individual Capacities

It is axiomatic that prosecutors are absolutely immune from Section 1983 liability for acts

"intimately associated with the judicial phase of the criminal process" such as initiating

prosecutions, presenting the Commonwealth's case, and pursuing a criminal prosecution. Imbler

v. Pachtman, 424 U.S. 409, 430-31 (1976). See also Kalina v. Fletcher, 552 U.S. 118, 124

(1997) (noting that a prosecutor is not amenable to suit under Section 1983 for activities taken in

connection with a criminal prosecution); Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993)

(explaining that "acts undertaken by a prosecutor in preparing for the initiation of judicial

proceedings or for trial and which occur in the course of his role as an advocate for the State, are

---

[7] The Court notes that Plaintiff was earlier provided with a second chance to serve Mr. Gibson by the Hon. Mary McLaughlin.

[8] The Court refers to Defendants Lynne Abraham, ADA Delaney, ADA Ehrlich, and ADA Carpenter as "the DA Defendants."

entitled to the protections of absolute immunity").  Absolute prosecutorial immunity extends to the professional evaluation of evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made.  Id.

Absolute prosecutorial immunity extends to any acts associated with the prosecutor's advocacy role and applies even if the prosecutor acted willfully or in bad faith.  Ernst v. Child & Youth Servs. Of Chester County, 108 F.3d 486, 502 (3d Cir. 1997).  Indeed, consideration of a prosecutor's personal motives is "directly at odds" with the Supreme Court's simple functional analysis of prosecutorial immunity.  Kulwicki v. Dawson, 969 F.2d 1454, 1464 (3d Cir. 1992).  This is true even when prosecutors deliberately withhold exculpatory evidence, fabricate evidence or introduce fraudulent evidence.  Imbler, 424 U.S. at 431 n.34; Knight v. Poritz, 157 Fed. Appx. 481 (3d Cir. 2005); Davis v. Grusemeyer, 996 F.2d 617, 630 n.28 (3d Cir. 1993).  See also, e.g., Kulwicki, 969 F.2d at 1463-64 (failing to conduct an adequate investigation before filing charges, initiating prosecution even without a good faith belief that a wrongdoing has occurred, and a prosecutor's knowing use of false testimony is absolutely privileged); Brawer v. Horowitz, 535 F.2d 830 (3d Cir. 1976) (upholding absolute prosecutorial immunity from lawsuit for money damages for federal prosecutor alleged to have conspired with witness to use perjured testimony and conceal exculpatory evidence).  This is also true when a prosecutor is aware that probable cause is lacking.  Burgoon v. Township of Exeter, Civ. A. No. 90-4781, 1990 WL 158323, at *2 (E.D. Pa. Oct. 15, 1990) (citing Wilkinson v. Ellis, 484 F. Supp. 1072, 1081 (E.D. Pa. 1980)).  The handling of evidence is also "clearly within the sweep of initiating and presenting the State's case."  Henderson v. Fisher, 631 F.2d 1115, 1120 (3d Cir. 1980).

15

The doctrine of absolute prosecutorial immunity precludes conspiracy-based claims as well.  See, e.g., Savage v. Bonavitacola, No. Civ. A. 03-0016, 2005 WL 568045 (E.D. Pa. March 29, 2005) (plaintiff's allegation that the district attorney and all of the other defendants acted in concert and conspired to deprive him of his federal constitutional rights was dismissed as a result of absolute prosecutorial immunity); Hull v. Mallon, No. 00-5698, 2001 WL 964115 (E.D. Pa. August 21, 2001) ("When the underlying activity is cloaked with prosecutorial immunity, a conspiracy claim is similarly precluded..."); Flowers v. Marino, No. Civ. A. 93-1212, 1993 U.S. Dist. LEXIS 12038, at *6-7 (E.D. Pa. August 25, 1993) ("Allegations that the district attorney and assistant district attorney conspired with others and that the wrongs [to plaintiff] were racially motivated, do not strip the prosecuting attorneys of their absolute immunity from civil damage claims," where the conduct complained of is "intimately associated with the judicial phase of the criminal process"); Barnes v. City of Coatesville, No. Civ. A. 93-1444, 1993 WL 259329, at *8 (E.D. Pa. June 28, 1993) ("[Plaintiff's] allegation of conspiracy does not affect [the assistant district attorney's] entitlement to immunity .. . . [The assistant district attorney is] absolutely immune from liability for the Section 1983, 1985, 1986 and 1988 claims for malicious prosecution.").

The Court finds that the acts that the Plaintiff allege fall within the DA Defendants' prosecutorial function.  Put simply, all of the alleged wrongful acts cited by Plaintiff concern the decision to prosecute and the handling of Plaintiff's prosecution once that decision was made. Accordingly, even if Plaintiff's allegations were true, the DA Defendants are immune from liability for their actions.  Therefore, on the basis of absolute prosecutorial immunity, the Court will dismiss Counts One through Nine of the Complaint against the DA Defendants in their

individual capacities.

**b.   Count Four Against DA Defendants in Their Official Capacities**

Plaintiff is also suing the DA Defendants in their official capacities in Count Four.[9]  This is a Monell claim, because official-capacity lawsuits represent only another way of pleading an action against an entity of which an officer is an agent.  In Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), the Supreme Court held that municipal liability under 42 U.S.C. § 1983 cannot be based on the *respondeat superior* doctrine, but must be founded upon evidence that the government unit itself supported a violation of constitutional rights.  Id. at 691-95; see also Bielevicz v. Dubinon, 915 F.2d 845, 849-50 (3d Cir. 1990).  Municipal liability only attaches when the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  Monell, 436 U.S. at 694; Bielevicz, 915 F.2d at 850.

Thus, there are two ways that a plaintiff can establish municipal liability under § 1983: policy or custom.  Under Monell, a plaintiff shows that a policy existed "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict."  Bielevicz, 915 F.2d at 850 (quoting Andrews v. City of Philadelphia, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting Pembaur v. City of Cincinnati, 475

---

[9] The Supreme Court has held that personal immunity defenses, such as absolute prosecutorial immunity, are unavailable to defendants in § 1983 official-capacity actions. Kentucky v. Graham, 473 U.S. 159, 166-67 (1985); see also Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr, 518 U.S. 668, 677,  (1996) ("Immunity from suit under § 1983 extends to public servants only in their individual capacities").  The "only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses."  Hafer v. Melo, 502 U.S. 21, 25 (1991).

U.S. 469, 481 (1986))).  A plaintiff may establish a custom, on the other hand, "by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law."  Id. (citing Andrews, 895 F.2d at 1480).  In other words, custom may be established by proving knowledge of, and acquiescence to, a practice.  Fletcher v. O'Donnell, 867 F.2d 791, 793-94 (3d Cir. 1989).

It is clear under either route that "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom."  Bielevicz, 915 F.2d at 850 (citing Andrews, 895 F.2d at 1480).  In order to determine who has policymaking responsibility, "a court must determine which official has final, unreviewable discretion to make a decision or take an action."  Andrews, 895 F.2d at 1481.

In addition to proving that an unlawful policy or custom existed, a plaintiff also bears the burden of proving that such a policy or custom was the proximate cause of the injuries suffered. Bielevicz, 915 F.2d at 850 (citing Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984)).  "A sufficiently close causal link between ... a known but uncorrected custom or usage and a specific violation is established if occurrence of the specific violation was made reasonably probable by permitted continuation of the custom."  Bielevicz, 915 F.2d at 851 (quoting Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir.1987)).

Here, Plaintiff's claims against ADA Delaney, ADA Ehrlich and ADA Carpenter fail because under Pennsylvania law, only the District Attorney – and not Assistant District Attorneys – possesses policymaking authority for the District Attorney's Office.  Payson v. Ryan, 1992 U.S. Dist. LEXIS 6790, at *33 (E.D. Pa. May 14, 1992), aff'd, 983 F.2d 1051 (3d Cir. 1992).  Because

18

ADA Delaney, ADA Ehrlich and ADA Carpenter never possessed policymaking authority, Plaintiff can not establish official-capacity suits against them pursuant to <u>Monell</u>.  Claim Four will therefore be dismissed as to Defendants ADA Delaney, ADA Ehrlich, and ADA Carpenter.

There remains Defendant DA Abraham, who is the relevant decisionmaker for the DA's Office.  Plaintiff's claims against Defendant DA Abraham are three-fold and arise out of his nebulous attacks on the "Supervisory Defendants."  Plaintiff phrases his Complaint in terms of three claims against the Supervisory Defendants.  First, Plaintiff asserts that the Supervisory Defendants "agreed to, approved, and ratified a policy of unconstitutional conduct which they knew "through the chain of command" included conduct of manipulative investigative procedures, intimidation of witnesses, concealment of exculpatory evidence and fabrication of false evidence.  Complaint ¶¶ 194-96.  Second, Plaintiff contends that Supervisory Defendants "established a policy or custom encouraging Philadelphia Police officers to target suspects for selective enforcement of the criminal laws," and that the police effectuated this policy by "engaging in selective and malicious prosecution, excessive use of force, manufacturing of false evidence, and filing of false police reports against suspects in sexual abuse cases."  Complaint ¶¶ 198-99.  Third, Plaintiff alleges that the Supervisory Defendants "had actual or constructive knowledge that the MDT team members did not have the experience or training to direct a complex criminal investigation," but nevertheless "allowed MDT team members to direct investigations knowing, or with deliberate indifference to the likelihood that [her] decision would result in violations of Plaintiffs' constitutional rights.  Complaint ¶¶ 201-06.

In examining a *pro se* Complaint, the court must liberally construe the plaintiff's pleadings, and apply the applicable law regardless of whether the *pro se* litigant has mentioned it

by name.  Dluhos v. Straberg, 321 F.3d 365, 369 (3d Cir. 2003).  All "doubtful questions" are to

be resolved in favor of the Plaintiff.  Gray v. Occidental Life Ins. Co. of Cal., 387 F.2d 935, 936

(3d Cir. 1968).  Here, Plaintiff's unclear Complaint  uses the words "policy," "custom," and

"practice" interchangeably, and it is difficult to decipher what he actually intended to plead.

However, it is clear that the Complaint contains no references to any specific policies, written or

otherwise, and no real substantive factual allegations that would support the assertion that

Defendant DA Abraham, as policymaker, instituted or authorized specific policies that harmed

Plaintiff.  Instead, the Complaint is couched in more general terms and is more fairly read, in

Plaintiff's favor, to assert that Defendant DA Abraham, as a "Supervisory Defendant,"

acquiesced to an unconstitutional custom and practice rather than a formal policy.  Accordingly,

the Court will treat Plaintiff's first two claims recited above as alleging a claim based on practice

or custom.  Plaintiff's third claim recited above is a "failure to train" claim.

### i.        Practice or Custom

As discussed above, to state a claim against Defendant DA Abraham in her official

capacity, Plaintiffs must allege "that, through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged."  Berg v. County of Allegheny, 219 F.3d 261, 276 (3d

Cir. 2000) (quoting Board of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 404,

(1997)).  Plaintiffs must allege that the DA's Office, led by Defendant DA Abraham, acted

consistently with a municipal practice or custom which caused a deprivation of a constitutional

right.  In other words, Plaintiff may survive a motion to dismiss by alleging that Defendant DA

Abraham, on behalf of the DA's Office, had knowledge of, and acquiesced to, a constitutionally

harmful practice.

20

Construing the Complaint liberally, Plaintiff's Complaint alleges that Defendant DA Abraham, as one of the "Supervisory Defendants," either encouraged or acquiesced to a pattern of conduct, which included manipulative investigative procedures, intimidation of witnesses, concealment of exculpatory evidence and fabrication of false evidence, that was so pervasive and well-settled as to constitute a practice or custom within the meaning of the law.  Beyond that, Plaintiff has also alleged that these practices and customs both violated his rights and were the proximate cause of his injury.

The Court is reminded that the considerations underlying the factual specificity requirement "must be balanced against the equally important policies that *pro se* litigants not be denied the opportunity to state a civil rights claim because of technicalities, and that litigation, when possible, should be decided on the merits."  Kauffman v. Moss, 420 F.2d 1270, 1276 (3d Cir. 1970).  Balancing these considerations, the Court finds that Plaintiff, although barely, has sufficiently alleged a factual and legal basis for a deprivation of his constitutional rights due to a practice or custom and, thus, has pleaded a Section 1983 claim against Defendant DA Abraham in her official capacity.  Moreover, because Defendant DA Abraham was able to respond to Plaintiff's Complaint with particularized knowledge of this matter in her Motion to Dismiss, she has been provided with adequate notice of the facts to allow her to answer the complaint. Accordingly, while Plaintiff's Complaint as to this Count barely meets the standard to survive a Motion to Dismiss, this Count will not be dismissed. [10]

_____

[10] The Court notes, however, that the Complaint is sufficient only to the extent that it is alleging custom or practice of the DA's office, as Plaintiff has not established that Defendant DA Abraham is the relevant decisionmaker for the Philadelphia Police Department.

21

### ii.        Failure to Train

As with other § 1983 claims, to establish liability for a "failure to train" claim, a plaintiff need not prove a municipality has a formal policy of not training its employees.  See City of Canton v. Harris, 489 U.S. 378, 390 (1989) ("It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees.").  A municipality with a constitutional policy could nonetheless be liable on a failure to train claim.  "[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  Id.  Nonetheless, an allegation of "failure to train" can be the basis for liability under § 1983 only in limited circumstances.  Id. at 387.  "City of Canton teaches that municipal liability for failure to train cannot be predicated solely on a showing that the City's employees could have been better trained or that additional training was available that would have reduced the overall risk of constitutional injury."  Colburn v. Upper Darby Twp., 946 F.2d 1017, 1029-30 (3d Cir. 1991).  To maintain a failure to train claim, a plaintiff must allege that the failure amounts to deliberate indifference to the constitutional rights of the person with whom the municipal agents come in contact.  See id. at 1028.  In other words, "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality . . . can a city be liable for such a failure under § 1983."  City of Canton, 489 U.S. at 388.  In addition, the identified training deficiency must be closely related to the ultimate constitutional injury.  Id. at 391; Colburn, 946 F.2d at 1030.

Here, Plaintiff merely alleges, in conclusory fashion, that the "Supervisory Defendants"

22

failed to properly train members of the MDT and thereby demonstrated deliberate indifference to Plaintiff's constitutional rights.  However, this bald assertion comes at the end of a very lengthy Complaint that nowhere alleges any facts relevant to the training of the MDT (or lack thereof) or the relationship between that training and performance of the members' jobs (particularly as relevant to Plaintiff's investigation).  Instead, the Complaint merely alleges that the "Supervisory Defendants" acted in bad faith to injure him.  In other words, Plaintiff's failure to train claim is predicated "solely on a showing that the City's employees could have been better trained."  Colburn, 946 F.2d at 1029-30.  Accordingly, Plaintiff's failure to train claim will be dismissed.

## IV.   Conclusion

All claims will be dismissed against all Defendants with prejudice, with the exception of (1) Count 4 (42 U.S.C. § 1983 - practice or custom) as to Defendant DA Abraham in her official capacity and (2) Count 12 (intentional infliction of emotional distress) as to Defendant Knight.

An appropriate Order follows.